IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,
Plaintiff,

vs.

ANTHONY VÁZQUEZ-ARROYO (1),
Defendant.

Case. # 3:11-CR-00325-DRD
Case # 3:17-CR-00085-DRD-MEL

### SENTENCING MEMORANDUM

Circumstances of life. They affect each one of us in different ways. For Anthony Vázquez-Arroyo his circumstances of life began on November 21, 1987 when he was born to two parents who were drug addicts. Not a good start in life.

Anthony's short life on this earth is one that if full of life events one would not wish on any person. The circumstances that he lived through as a child have affected Anthony's life since then, and they have left traumatic scars. The circumstances of Anthony's life bring him before this Honorable Court.

When Anthony was young, his parents took their children to live with them in Villa Palmares, a low-income neighborhood in Santurce, Puerto Rico. While there as a child, he was witness to gang violence, drug dealing and drug use, which included his parents. Both his mother and father were addicts: his mother was a crack-addict, and his father dabbled in all different kinds of drugs and was an alcoholic. The parents did not exercise supervision over their children: Jan Carlos, Christian, and Anthony, the youngest. When Anthony's parents were at home, even if they were not high, the situation was no better. Anthony's parents would beat their children brutally. Beatings on Anthony included hitting him with electric cables, beating him with fists, and burning him using the stove or any other method available to his parents. Anthony's parents

1

never showed him any love, or even concern, for that matter. All they did was use drugs, beat their children, and order them around. In fact, Anthony was called "*tito mandao*" by those around him because he was known for merely being ordered around by his parents.[1] While most young children at such a tender, innocent age are concerned with school, learning to play baseball, or riding a bike for the first time, Anthony was focused on survival. Before he even reached ten years old, Anthony had developed the attitude of a "survivor" – believing he could trust or rely on no one but himself, or perhaps his older brother, Jan Carlos, for safety.

He and his family later moved close-by to Las Margaritas housing project, where his life did not improve. The neighborhood was riddled with drug users, drug dealers and gangs. He would witness his parents indulging in the use of cocaine and crack.

At the age of ten, his parents separated, he remaining with his mother and siblings. Horrifically, at around twelve years old, Anthony was nearly beat to death by his mother when she was addicted to crack. His mother was subsequently arrested for the assault on her son, among other charges, and she was incarcerated at the state level. The Department of Social Services removed the children from the mother's residence and placed them in separate foster homes. Anthony was sent to live in Moca with the Ramos family.

Anthony describes his time in Moca as the first peaceful years in his life. The Ramos' were a humble family; Mr. Ramos worked in construction and Mrs. Ramos worked in public school kitchens. With the Ramos, he had his own room, television and everything was clean. But what stands-out most in Anthony's mind was his feeling of "family". His foster family showed him unity, care and most importantly love. The result of which was his enjoyment in reciprocating – going to school, helping with the chores, behaving himself. There were no more punishments nor beatings. In fact, his foster parents even bought him a horse. His life was

---

[1] "Mr. go-do-this".

idyllic and his future promising. Life circumstances were changing in his favor, but then they changed again.

During the first few years of foster care, Anthony did not see his parents. It was not until a few years later, when his mother was out of a stint in jail and both parents were relatively clean from drug-use, they started to visit Anthony. His parents only came one day per week, always on the weekends, and would meet with Anthony in a fast-food joint near Moca, such as a KFC or Burger King, where they would spend one to two hours with their son, before returning to San Juan. He does not understand why, but apparently, when he was 15 years old the Department of Social Services decided to return him to his father, who still lived in Las Margaritas housing projects. All of the positive changes that had slowly started to develop in Anthony's life in Moca were suddenly taken away. He was not returned to his mother because she continued using drugs. Instead, he clearly remembers arriving at his father's apartment and his father's greeting was, "what the hell are you doing here?" Definitely, not a good sign of things to come.

While in Moca at his foster home, he completed the 5th grade. However, once he moved in with his father, there were no role models like that in the Ramos family. He received no emotional or psychological support from his father, who continued to consume drugs in front of his son. His father basically used him as an errand-boy sending him to get food, pay bills, wash his cloths and attend to his father's needs. Having no motivational support to study, Anthony stopped going to school. Instead, he maintained himself financially doing errands and picking-up and throwing away garbage for the residents of the housing project.

By this point in Anthony's life story, the reader cannot help but ask himself: where was the state in this young man's life? Where was the Department of Family? Where was the Department of Education? Where was the Justice Department? Anthony's parents had failed

him, and the system had failed him. He was a young man, toughened by his brutally harsh childhood, and he was alone.

While living the above-mentioned life style at Las Margaritas Housing Project, Anthony fell into a bad crowd and began using drugs. At the age of 17 he started smoking marihuana and at the age of 18 he began to use Percocet and Klonopin taking 15-20 pills per day. It is no surprise then that, given his life's circumstances, he was arrested at the age of 19 for a controlled substance violation, which was eventually dismissed.

Anthony could not handle living with his drug-addicted father any longer, and he decided to ask his maternal grandmother if he could live with her in Barrio Obrero. While living with his grandmother he felt emotionally and psychologically better since she provided him with love and support. During this time, he found work at Mudaford Sport Shop in Santurce, where he worked for two years in maintenance and assisted in the repair shop. However, as it tends to for many people, his use of drugs further derailed him. At the age of 20 he began using cocaine and at the age of 23 he began snorting heroin and xanax. Anthony had triggered something he had always wanted to avoid: a drug addiction just like his parents. This heavy drug use together with his unsavory acquaintances led him directly into a quick downward spiral which contributed to his being arrested on a local gun charge, where no probable cause was found.

It was also during this time that an event occurred in Anthony's life that would plunge him into a state of desperation and depression: his beloved brother, Jan Carlos, was murdered in senseless violence when Anthony was around 21 years old. Jan Carlos was the only person, apart from perhaps his grandmother and the Ramos, who had brought any semblance of caring into Anthony's life, and he was tragically taken from him. Anthony himself states that after Jan Carlos's murder, he lost all sense of self and was now completely consumed by his drug-use.

Anthony was addicted to drugs and desperate for money, and this led him to his first federal case, in 2011. After his arrest, Anthony could hardly remember anything about the events leading up to it, because he was so high on drugs. Ashamed of his actions, Anthony accepted complete responsibility of the charges against him.

On April 17, 2012, he was sentenced to 63 months of imprisonment and 5 years of supervised release for his federal case.



*Zoe, Anthony, and Ian.*

Anthony relates that his time in prison was relatively productive: he began taking barbershop classes, which he thoroughly enjoyed, and he started taking classes in the drug recovery program. It was an unlikely day in federal prison, however, that changed Anthony's life.

Towards the end of his incarceration, Anthony was having a normal day in prison, nothing out of the ordinary. At some point in the day, Anthony decided to make a phone call from prison to a friend of his in Puerto Rico. Unlike on other days, on this particular occasion, Anthony accidentally dialed a digit of his friend's telephone number incorrectly. A sweet voice answered the phone instead, a young woman. Intrigued as to why she was receiving a call from a federal prisoner, she stayed on the line. Her name was Zoemillet Rivera, Zoe for short, a young woman living and studying in Arecibo, Puerto Rico. She and Anthony continued talking, and at

the end of the call, Anthony promised he would call again. And so began their love-story. Anthony and Zoe began communicating often, almost daily. Anthony was dumb-founded: this young woman clearly knew he was a convicted felon, because she answered the call from a federal BOP call-line, but she did not judge him. Instead, Zoe asked Anthony questions and wanted to get to know him. They decided to try dating when Anthony was released from prison.


*Zoe and Anthony having a celebratory dinner after Zoe's graduation. "The afternoon of my graduation."*

When Anthony was released, on April 14, 2016, he was flown back to Puerto Rico from Miami, where he had been incarcerated. He and Zoe had arranged for Zoe to pick him up at the airport, where they would finally meet in person. Of course, on the day of the meeting, Zoe was too nervous to go alone, and she brought a friend along. As soon as they met, however, Zoe realized she had nothing to fear from Anthony. The two immediately began dating. Anthony says Zoe changed his life completely. For the first time since he was a child, someone truly cared for him. Zoe encouraged him to learn to read and write better. Zoe inspired

Anthony because she was studying, and she just completed an Associate's degree as a Physical Therapist's assistant. She indicates that Anthony supported her throughout her studies, and he himself took her to her graduation. Zoe brought Anthony to family events in Arecibo, an area of the island Anthony had never been. Anthony said being away from the metro-area brought him peace, like his years as a child in Moca.

Perhaps most importantly, Zoe introduced Anthony to her son, Ian. Anthony and the child immediately hit it off. Anthony enjoyed being with Zoe and Ian, doing all the things he never got to experience as a child.

Despite the positive changes taking place in Anthony's life, he still suffered greatly from the traumas of his childhood and adolescence. Because he and Zoe's relationship was so new, he continued to live in the Barrio Obrero area with his grandmother until he and Zoe were ready to live together. He did not have any education or job skills, and basically lived the life of the streets, which led to relapses with drug use, despite his first months under supervision being clean.[2] He also unfortunately reunited with his old acquaintances. This resumption of his old life-style directly contributed to his present legal problems, where he finds himself before this Court for the instant gun charges and revocation of his supervised release.

Why, if life's circumstances were improving for Anthony, would he fall back into his old lifestyle? Anthony suffered a violent childhood, which likely had a large impact on who he has grown into as an adult. In 2012, former Attorney General Eric Holder ordered an immense study on the impact of childhood violence, called the National Task Force on Children Exposed to

---

[2] In addition to his new criminal case, Anthony is facing revocation in the case 11-325 (DRD). In addition to the violations of supervision for new criminal conduct, Anthony faces grade C violations for positive drug test results. *See* D.E. # 51. Anthony does not contest these violations, and instead takes full responsibility for the same.

Violence. *Available at* https://www.justice.gov/sites/default/ files/defendingchildhood/cev-rpt-full.pdf.

The study demonstrated that "[p]hysical abuse puts children at high risk for lifelong problems with medical illness, posttraumatic stress disorder ("PTSD"), suicidality, eating disorders, substance abuse, and deviant sexual behavior. Physically abused children are at heightened risk for cognitive and developmental impairments, which can lead to violent behavior as a form of self-protection and control. These children often feel powerless when faced with physical intimidation, threats, or conflict and may compensate by becoming isolated (through truancy or hiding) or aggressive (by bullying or joining gangs for protection). Physically abused children are at risk for significant impairment in memory processing and problem solving and for developing defensive behaviors that lead to consistent avoidance of intimacy." Report of the Attorney General's National Task Force on Children Exposed to Violence, at 3-4, Department of Justice, Dec 12, 2012. ("Report").

Exposure to violence as a child causes major disruptions of the basic cognitive, emotional, and brain functioning that are essential for optimal development and leaves children traumatized. *Id.* at 27. When their trauma goes unrecognized and untreated, as in Anthony's case, children are at significantly greater risk than their peers for aggressive, disruptive behaviors; school failure; PTSD; anxiety and depressive disorders; alcohol and drug abuse; and delinquency. When left unaddressed, these consequences of violence exposure and the impact of psychological trauma can persist well beyond childhood, affecting adult health and productivity. **They also significantly increase the risk that, as adults, these children will engage in violence themselves**. *Id.* at 27 (emphasis added).

Anthony experienced such extreme violence as a child, and he has never been properly treated or given the tools necessary to move forward. As a result, he continues living his life in this state of "fear" or "defense", just as he did as a small child trying to survive his parents' beatings. When violence is chronic, or sources of support are inadequate, the result can be a severe and lasting impact on **every aspect of the child's development**.[3] Like in Anthony's case, there was no recovery treatment given to help him move from the trauma of his childhood and drug abuse to develop interpersonal skills, much less skills necessary to find gainful employment. Instead, Anthony adopted the "attitude of "survivors" who can rely only upon themselves for safety and to cope with feelings of despair and helplessness." *See* Report at 30**.** We know from recent advances in neuroscience that such survival coping Survival-oriented biological changes are necessary for the traumatized child's immediate coping and self-protection during the actual violence exposure, but when they persist after the danger has subsided, brain and psychological development are significantly compromised. *Id.*

**This does not mean that Anthony's brain is faulty or broken;** instead, he is stuck in a perpetual state of readiness to react without thinking to even the smallest threat. The Report indicates that those who have lived a life like Anthony grow up and then live **in a near-constant state of high alert, a survival mode in which they never trust anyone — even people who really are trustworthy — can never relax, and never stop bracing for the next assault or betrayal.** Anthony may meet the criteria for PTSD. However, PTSD is only one of several emotional and behavioral disorders that can result from exposure to violence in childhood. Children exposed to violence and psychological trauma also are at high risk of being victimized or **becoming violent themselves**. *Id.*

---

[3] D'Andrea, W., et al. (2012), "Understanding interpersonal trauma in children: why we need a developmentally appropriate trauma diagnosis", *American Journal of Orthopsychiatry*, 82(2), 187–200.

These findings resound so strongly in Anthony's case. Though released from incarceration, back on the streets of Barrio Obrero, he continuously found himself in that "frozen" state, or rather, the same state of mind he had since he was a little boy – ready to go on the defensive at any hint of insecurity. It helps explains why he is before this Court.

Life's circumstances: one cannot help but wonder if Anthony had not been born to parents who were drug addicts, had not lived in the poorest sections of the metropolitan area with its attendant criminal environment, had he not been horribly physically abused as a child, had he been given emotional, psychological support by his parents, had he been urged to go to school, had he had good role models, had he not been inexplicably ripped away from the environment of his foster home which was such a positive period in Anthony's life, would his life been different? We certainly believe so.

### **Going Forward**

So what is to be done with Anthony? Put him in jail and discard the key? Or, fashion a remedy that will help him change the up-to-now circumstances of his life?

According to Anthony, he rejects his past life and wants to make a constructive change. While in prison, he wishes to take intensive drug prevention courses and study English and vocational courses that eventually will allow him the ability to obtain gainful employment.

In addition, "[t]he single best predictor of successful release from prison is whether the former inmate has a family relationship to which he can return. Studies have shown that prisoners who maintain family ties during imprisonment are less likely to violate parole or commit future crimes after their release than prisoners without such ties."[4] Anthony Vázquez now proudly falls in this category of offenders. Unlike in his previous case, he now has a family to return to after his release.

---

[4] Solangel Maldonado, *Recidivism and Parental Engagement*, 40 Fam. L.Q. 191, 196-197 (2006).



In order for Anthony to have the opportunity to meet these goals, and receiving a sentence that is sufficient, but not greater then necessary, we respectfully suggest and request that this Honorable Court sentence Anthony to a total of 57 months of imprisonment. It is also respectfully submitted that the Court ORDER the Bureau of Prisons to provide him with an intensive drug rehabilitation program combined with psychological treatment, and English and vocation courses, so that he can start a fresh drug-free life with the ability to be gainfully employed so he can support himself, his wife and child.  In addition, the Court should allow Anthony to complete his supervised release either in the continental United States or in the west side of the island, where he will be far away from the environs of the metropolitan area.  In short, we request this Honorable Court to provide Anthony with the tools to change his life's circumstances, change his path in order to become a meaningful member of our society. It is

11

respectfully submitted that the Court order a sentence that will allow Anthony to continue to hope.

**Wherefore,** it is respectfully requested that this Honorable Court, take note of the above when determining the appropriate sentence for Anthony Vázquez-Arroyo.

**Respectfully Submitted.**

In San Juan, Puerto Rico this 20th day of July, 2017.

**Certificate of Service:** I hereby certify that on this date, July 20, 2017, the instant motion has been filed with the Clerk of the Court through the CM/ECF system which will send copy and notification of filing to **AUSA David Thomas Henek** and to other all parties.

*/s/ José R Aguayo Caussade*
**José R Aguayo Caussade, Esq.**
USDC-PR # 123301
569 Tnte. Cesar González St.
Urbanización Baldrich
San Juan PR 00918-3712
Telephone (787) 765-0814
Facsimile (787) 274-0071
E-Mail: joseraguayo@gmail.com


*S/Jessica E. Earl*
Jessica E. Earl
Research and Writing Specialist
USDC-PR No. 302613
241 F.D. Roosevelt Ave.
Hato Rey, P.R. 00918-2441
(787) 281-4922/ Fax (787) 281-899
E-mail: Jessica_Earl@fd.org